Madam Clerk, please call the first case for argument. We have Mr. Vondra for the opponent and we also have Ms. Nydell. Case number 21-2033 Northern Iowa United States v. Jason Corey. All right, Mr. Vondra, the court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act and you may proceed with your argument. Thank you, Your Honor. May it please the court, counsel, this appeal is about making the government play by the rules and it's about fairness. In these drug cases, oftentimes the government and its agents can get so caught up in the competitive spirit of the adversarial process that sometimes the courts need to rein in the government so that they have to play fair. In Mr. Corey's case, we can see this from the beginning of the trial. The testimony from the government's first witness, Officer Kelly Meggers, who testified as an expert on drug conspiracy cases. On a cross-examination, she admitted that one of law enforcement's tools in drug conspiracy cases is deception. The public would think of that as a lie. We go all the way back to the beginning of Mr. Corey's case. We kind of look at this case frontwards and backwards. Our sentencing exhibit, B, had a clip of Mr. Corey's initial interview. That showed some of the other misrepresentations that the government made right off the bat in Mr. Corey's case. That there's no time to get a lawyer. Of course there was time to get a lawyer, it was the middle of the night. This is your only chance to help yourself. Of course there's more time to help yourself. The government's always looking for people to cooperate. They insinuated that if he talked to them, he wouldn't end up getting a long sentence and dying in prison as he was getting older. We can't guarantee anything. Again, they can guarantee things. When Mr. Corey talks to them and talks about his full involvement in the conspiracy, the drug quantity, instead of being a lower amount that he was actually caught with, goes up, which ratchets up the guidelines. That's mostly the reason why he's facing a 24 and a half year sentence at this point. The other misrepresentation that comes into play, government agent Circle says they can doctor up paperwork during this interview so people aren't suspicious about Mr. Corey's arrest and detention. On a larger scale, the other big picture false narrative pushed by the government, especially in these types of cases, is that all defendants accused of drug conspiracies who possess a firearm are dangerous. The government's own actions in this case prove otherwise. The government let Mr. Corey out of jail after the August 2019 interview until April 2020, at which time he was arrested at the place where he told the government he was going to be. The government let the alleged co-conspirator, Ashby, out all the way back in August of 2018 before Mr. Corey allegedly conspired with him. The indictment says Corey joined the conspiracy in January of 2019. The Brady affidavit that we mentioned was IDing Ashby as the head of the drug trafficking organization and that's where the government evidence showed that the gun found in Mr. Corey's home came from. So in a sense, when you look at this, Corey's crimes could have been prevented had the government taken down Ashby back in August 2018 because Corey wasn't even part of the conspiracy at that point. He didn't start until January of 2019 by the government's own indictment. And we believe that those facts are important for the 3553A factors, promoting respect for the law, preventing crimes, protecting the public. It's only fair to consider those factors on the front end when the case is with law enforcement. Those are part of the facts and circumstances of the offense. Now turning towards our first main legal issue, the mistrial issue, when we actually got into the trial, we had Officer Circle get up and take an oath to tell the whole truth. And we believe that the government violated the trial management order in Federal Rule of Evidence 615. The trial management order was very specific. It's at document 15, pages 16 and 17. It's got general prohibitions. Well, it's got very specific prohibitions on hearing other witnesses testify. And then there's generic prohibitions on talking with others more generally about what happens in court if you're going to be a testifying witness. Randomly, I happened to ask Agent Circle if he talked to anyone about what happened in court the previous day, and he wouldn't answer. Repeatedly, all we could get was, I did not talk to anyone about my testimony. He's a trained... Tom, so did you ask the district court to compel answers to the questions that you wanted answered? I did not ask the district court to compel... Why not? I mean, the district court expressed some frustration with questioning below. If you had an entitlement to those answers, you should have asked for them. Why didn't you? Well, he did eventually come around and admit that... So he did answer them? Eventually he did, yes. He did eventually admit, and I think I quoted his exact words, that he had colleagues discuss what happened in court with him. So your issue is not that he didn't answer, but your issue is with his answers? Yes, with his subsequent answer. That admission... So what specifically did he do that you find problematic that required a new trial? Yeah, he admitted that his colleagues and he discussed what happened in court. So when you look at... Did you flesh that out at all on cross-examination about what specifically was discussed and what the prejudice was? He would not... Did you ask him? Did you ask him? I did ask him and he kept repeating... Did you ask the district court then to compel those answers? I did not. I mean, that seems to me to be my read of the district court's frustration with the issue and its basis for the denial of the motion, don't you agree? Yes, that was what the district court did say below. Thank you. Part of the other reason for the denial was the district court mentioned that we were violated the rule. When you actually look at his answer, we weren't speculating. He did admit that they violated the rule, that they talked about what happened in court. When you go back to the specific language in the trial management order, that's exactly how it's worded. So... So, Mr. Vonder, if we... Let's assume for purposes of this question that there was a violation of the pretrial order, where's the abuse of discretion in not granting the new trial? Where were the substantial rights would be affected? What is the substance of the problem? Because as I saw it, it was only Officer Meggers that had testified previously as an expert. So tell us how this mandated a new trial. Well, in terms of the prejudice, we do think that there was prejudice here. The government talks about how strong the evidence was on the conspiracy charge, which is true, but they don't talk in their brief about the evidence on the gun charge. So if the other side knows our whole theory of the defense and is talking about what our strategies and our theory is as they're testifying, they have a lot more ability to just kind of steamroll through the trial. And what we were trying to go for on this case is to avoid the gun conviction, which the government doesn't talk about in its brief. The gun case was a lot closer. It was a gun that was found in the home. There was another person living in the home. The question was whether the intent of the possession of the gun furthered the drug conspiracy or if he just had a gun, essentially. Were those the kinds of questions that you were asking the first witness? Ms. Meggers? Correct. Yeah. That was the first witness as I understood it. Right. So I guess I did ask her if she had ever seen a case where a person had possessed a weapon that didn't further the drug conspiracy. She did talk about that a little bit. I think her response was that it's possible, but that she had never seen that in her career. So that was really the prejudice in our case is really to the gun charge more than the more difficult case for us. Now when we turn to the sentencing error, and I'll probably get to this a little bit more, but I do want to just address the sentencing error in the larger sense because it's another hard standard of review in terms of abuse of discretion. If the sentence is greater than necessary to accomplish the goals in 3553A, it is an unreasonable sentence and an abuse of discretion. So we're asking the court to really go back to the text of the statute because the standard of review isn't as high when you think of it as an abuse of discretion means even a sentence that is a little bit greater than necessary, if the sentence is even a little bit greater than necessary, that is an abuse of discretion. Counsel, isn't that the definition of discretion? Not the definition of an abuse of discretion? Well I think... In other words, if, you know, hypothetically, if the district court gives a sentence of 120 months and all three of us sitting here say, hey, it should have been 90, I mean the question is really about the abuse of discretion, is it not? I think so. I mean, these cases, I mean, they're hard to win for defendants on an abuse of discretion standard, right? I mean, that's just the deck you've been dealt here, or the hand you've been dealt, but it seems to me that there is broad discretion for the district court on these sorts of issues. Why am I wrong? Well, there is broad discretion. I think it's an approach thing. So obviously the court has to start with the guidelines. So the court looks at the guidelines, 235 to 293, and then 60 months consecutive on the gun charge, and okay, that's the guidelines, and then you look at, okay, this case involves mandatory minimums, so we have to have 15 years or 180 months, and then you look at the factors and ask yourself, okay, if I sentence a 53-year-old man with one criminal history point, no felonies, no prior prison time, that has hepatitis C, who had a very short period of time when he was in this conspiracy, who helped the government, is the 15-year sentence sufficient to reflect the seriousness of the offense, deter criminal conduct, protect the public, and provide the defendant with educational, vocational training, treatment, and those sort of things? So if you phrase it that way, 15 years for somebody in Mr. Corey's situation was sufficient, and then if it's not sufficient, how do you justify adding so much more time to that and proving that that's necessary? So I guess kind of to come back to that, then, I would argue that it's not necessary. It was sufficient at even the bottom end, and to go up and up, you have to prove or establish that the facts were so aggravating that it was necessary to go above that, and then if that's not in the record, then it is an abuse of discretion. So I think with that said, I will reserve a couple minutes here for rebuttal. Thank you. Just so I'm clear on that last point you're making, you say there needed to be reason to go above something. I understood the court sentenced Corey at the bottom of the advisory range. Is that correct? And if so, what did you mean, above what? I'm talking about above the mandatory minimum. So this case involves the mandatory minimum. Okay. Understood. Thank you for your argument. Ms. Neidl, we'll hear from you. May it please the court, Emily Neidl, Assistant United States Attorney for the Northern District of Iowa, representing the United States today. In this case, the court properly denied defendant's motion for mistrial and new trial, and the defendant was sentenced to a substantively reasonable sentence. I want to first talk about, Mr. Vonder indicated that our case with regard to the firearms was a tougher case, and our evidence was not strong. Would note that in this case, what we had was confessions by the defendant, and those were recorded, and they were extensive, and they included confessions that he had received those firearms from George Ashby, who he was also his drug source, and that specifically the firearms were for the purpose of protection. Arguably, that's an extremely strong 924C case. Additionally, we had information regarding the defendant wishing to take some action. They were in the form of text messages and some aggressive behavior, and these firearms were also confirmed to be consistent with another person who knew Mr. Ashby and had attempted to provide them. So I would disagree that our case was weak with regard to that. There was some discussion about the Mr. Circle's testimony, would note that with regard to prejudice, which defense doesn't really address in their brief, it was addressed at the district court at page 314. The district court asked Mr. Vonder what the prejudice was with regard to the statement, and he said, well, the prejudice then is the witness was prepared for the question. So the witness through the whole cross-examination was ready for that to come up and had an immediate explanation that didn't look as bad as if it would look if he had lied potentially, and that had been impeached with the latter, and that was his prejudice claim. Would note that the district court in its oral rulings went through an analysis that essentially confirmed that although evidence didn't support that this had been done, we could have prepared our witness for that very question without it being a violation. We couldn't necessarily have said Mr. Vonder said X in his opening, but we could have said, hey, with regard to whether or not you said something about doctoring up some paperwork, why would that be? What would have been your reasons? Would argue that in this case, the fact that he was prepared for that question has more to do with his training and experience, and the fact that reality is, yes, drug cases do involve some deception. That deception, as explained by our expert, is essentially to protect those who are cooperating with us. Ms. Beggars explained that they tell their CIs, don't tell your wife or your girlfriend even that you're cooperating, because it's dangerous for them, and they talk about the deception in that context. When Adam Circles then asked, well, why were you willing to give him doctored paperwork, his explanation essentially comes down to, we were concerned about his safety, and that because of that, we were willing to give him paperwork, so it explained why he was cooperating, or that explained why money would be missing in this case. So based on all of this- On the question whether there was a violation of the order, the witness did say that he what had happened in court yesterday, but I didn't talk to anybody about my testimony. He seems to think that the order prevents him from talking to other people about his testimony, but that it was okay for him to hear what had happened in court yesterday. You agree with that reading of the trial management order, and is that what you're advising the witnesses? So, I would say, Your Honor, that looking at how this played out, I don't think Mr. Circle was necessarily answering the question with consideration for what the trial management order said. I don't think there's any record as to what our advice was to him. Well, it looks like, counsel, he was being evasive on an honest question, in my opinion, respectfully. I think if you look, and I think the district court having this advantage is part of why their ruling is so clear, that they didn't find that he was necessarily evasive, that it was more a problem with the question. Mr. Vondra's cross-examination started immediately with this attack. Well, can you go back to my question? He says that he heard from others what happened in court yesterday. Do you feel that that is a violation of the order for him to hear from others portions of what happened in court yesterday? I think that there's a strong inference that there is a violation. I think there are things that could have happened in the courtroom that they discussed that wouldn't be a violation. As we detailed, there were some last minute continuances, there were issues relating to the trial and how fast it was going to go, if it was going to go at all. Those weren't flushed out by Mr. Vondra. They weren't flushed out at any point in the record. When Mr. Vondra asks for mistrial, the district court asks, well, what is it you want after reading in his email? Just going back to what the order means, are you saying it's okay for people who are in the courtroom to communicate to the witness about the kinds of things you just mentioned that happened in the courtroom during the trial? There has to be a certain element of communication as to things like, you're next up, or we're moving slowly, we're moving too quickly, those sort of things. Yeah, of course, and when to be there and so forth. But my concern is that he said, I had heard portions of what happened in court yesterday and the order says, a witness who may testify is prohibited from communicating with anyone including counsel about what has occurred in the courtroom during the trial. I just wondered if these witnesses understand that the order is as just stated and not limited to discussing his personal testimony. I know that's not in the record, so maybe that's a rhetorical question, but I do think there's a, as you already acknowledged, an inference here that he did go beyond the order. I think it's at least potential that he did. I think though when you loop back in this case, ultimately, in the spirit of this, these code sections and even the trial management order is so that we don't get our witnesses together, kind of collude their testimony, make sure that everybody's on board with essentially the same thing. There's no evidence. I don't know whether that happened or not. I'm sorry, Judge Palazzo. Well, I'm sorry. The order doesn't say you're prohibited from getting your witnesses together, including, it says you may not communicate with anyone about what has occurred in the courtroom during the trial. So your conception of the purpose doesn't match the text of the order and so if that's what the witnesses are being told, as long as you don't get together and collude, it's not, it seems like there may be a problem. And by a strict reading of the order, yes. It's not a strict reading. It's just the reading. It's a fair reading. I would consider it a fair reading, but I think if we then look at was there prejudice, which ultimately there has to be the prejudice element here. There's no showing that there was any prejudice to this defendant. The testimony that occurred previously was Officer Meggers, who has not anything to do with facts in this case. We then had a fact witness, which was Mr. Circle. Essentially what Mr. Vondra seems most upset about is he didn't get what I would call a Perry Mason moment. He didn't get the moment where while cross-examining Mr. Circle, Mr. Circle was caught in a lie and broke down and said, yes, I'm a liar and a horrible person. That didn't happen. And that seems to be the argument, the best argument defense has for any form of prejudice. Okay. Hold on. Judge Colbus and I were talking at the same time a minute ago, so he may have a question. Judge Collins, I think you covered what I was addressing in a more than adequate manner. So thank you. Turning to the Brady issue, I think it's helpful to understand this was a large scale drug investigation. It included wiretaps. Ultimately, it's important to understand, and I don't know that that's 100% clear, especially in reading the defense brief, that there was a source of methamphetamine in the Burlington area that was identified as a Corey Lowry. And as the course of this conspiracy went on, there was an individual named George Ashby who was being supplied in Burlington by Mr. Lowry due to some both legal issues and then some drug related issues for Mr. Ashby. Ultimately, two individuals that he was working with, a Henry Eilders and a Tony Brown, were brought in and then eventually took over the primary, picking up methamphetamine from Burlington and bringing it to Cedar Rapids. I think it's important to know these facts in part because it seems the defense has them slightly confused. We'd note that in his brief at page seven, defense indicates that we did not release until after the trial that Henry Eilders was a leader of the drug conspiracy and that he was known to move large quantities. At page 15, he again argues that it was known to us but not to him that Henry Eilders was trafficking drugs from Burlington to Cedar Rapids. That is completely inaccurate in that if you turn even to the trial testimony, specifically Brian Furman, pages 272 to 273, he explains in that section that they were listening to Mr. Eilders' phones, that based on that, they were able to intercept conversations and they learned that his source was in Burlington, Iowa, that they were aware that he was making cash payments and they would actually intercept those calls and then roll out and physically watch them. The idea that we didn't disclose prior to trial that this was occurring, we disclosed it literally in trial. Again, at page 274, there's again discussion regarding the fact that Mr. Ashby was originally our primary person going from Cedar Rapids to Burlington. He was getting multiple pounds and that was before the wiretap occurred. After the wiretap then began, at that point, it was primarily Henry Eilders and Tony Brown that were involved. Now, Mr. Vondra's original motion for a new trial, as the court noted, was a little less than clear with regard to this. We did as part of our response, those supply portions of our discovery, which showed that we had multiple items and we indicated in a footnote in our filing that this was just a portion of our discovery. There were interviews by individuals that both corroborated that Mr. Ashby and Mr. Eilders at different points were going to Burlington. This included reports of interviews with Henry Eilders himself indicating that he was dealing with Corey Lowry. There was numerous connections that way. There were even interviews where this defense attorney himself, Mr. Vondra, has participated in interviews discussing Mr. Ashby going to Burlington. His argument seems to be premised on the fact or an argument that as if only one individual could be going to Burlington. As with many drug conspiracies, this was somewhat fluid and was inconsistent with that. Based on his assertions, it appears that he is focused on the fact that we didn't say anything about Mr. Eilders going. I would also note with regard to his claims- Can I follow up, Ms. Neidl? Just what you said there at the end, now I'm trying to figure out what was not disclosed. Is it the fact that Mr. Eilders was actually going to, was it Davenport? Burlington, excuse me, Burlington and that that was not revealed previously? That seems to be the defendant's argument in the brief. And that's where the defendant was alleged and now is convicted of going to as well, right? No, he confuses some of the facts in that way. So his client was receiving things from Mr. Ashby. Mr. Ashby's source was then in Burlington. What we learned from Mr. Abbott and from the defendant himself, sometimes he would ride along with Mr. Ashby to go to Burlington. In particular, they would go on essentially golf trips together and while the car was parked while they were golfing, someone would put drugs in the car. Ultimately, these were Mr. Ashby's trips that sometimes Mr. Corey went on. At different times in defense brief, he seems to indicate that Mr. Abbott testified that Mr. Corey, I think specifically page 16, he says that Daniel Abbott testified that Mr. Corey trafficked large amounts of meth from Burlington to Cedar Rapids. The reality is what he testified to is occasionally he would accompany Mr. Ashby and that that's what Mr. Corey told Mr. Abbott. So what was the non-disclosure? What information did you have that you don't think had to be turned? I don't believe there was any new information. He claims that there is new information because this affidavit was disclosed and focuses on a single paragraph where it indicates that Mr. Eilders went to Burlington and his argument seems to be that we never told him that Eilders was going to Burlington, but based on our known entity, this was not new information. I think his summaries again of Mr. Abbott's testimony are inconsistent with what Mr. Abbott testified to. Mr. Abbott, to make sure the court's fully informed, was someone who had dealt with Mr. Ashby on his own prior to being arrested. He'd received some methamphetamine and they had had a discussion about some guns. He then gets indicted. He's in federal custody. He's in jail and he and Mr. Corey end up in cells next to each other and Mr. Corey begins to talk to him about his case and he tells him, oh, I dealt with this guy named George Ashby. We used to go to Burlington sometimes. We'd golf. They put drugs in the car and that's how Mr. Abbott becomes a witness in this case, despite not knowing Mr. Corey prior to the trial. I see that I am out of time, so unless there are any follow-up questions, I will just ask that you affirm the rulings by the district court and this defendant's sentence. All right. Thank you for your argument. Mr. Vonder, we'll hear from you in a little while. Thank you, Your Honor. Just briefly, the non-disclosure essentially was the affidavit from Officer Furman, who testified. It was a good summary that would have been helpful to have had before trial because it would have helped test the lay witness's knowledge of what the lay witness testified to. I agree with Ms. Neidel that it's not necessarily new information, but it was a very much more clear statement and summary report of the testifying witness that could have helped us impeach the lay witness. Then, just lastly then, going back to the trial management mistrial issue, honestly, this was kind of unexpected testimony. My whole purpose... You did have him admit that he heard portions of what happened in court yesterday, but after that, there's no further development of what he heard. That seems to be the missing piece here because in order to show prejudice, you may need to show more than you heard something in the abstract because we don't know if he just heard that the trial's going to take longer than we thought or less than we thought or if he heard something that would really be material to his testimony. I understand that, Your Honor. It's a tough spot to be in in the middle of a trial and ask the judge to force the government witness because if we're overruled, then that definitely looks bad for the defense. You had him admitting that he heard what happened in court yesterday, so you could have asked him in the follow-up, what did you hear? Like I said, initially, I expected him to talk. The point of it was to prove that he was working with the government and to kind of show his general bias, and then we kind of went down that path, so that's where we got to. With that said, I will thank the court for its time in doing this remotely for all of our safety. Thank you. Very well. Thank you both for your arguments. The case is submitted, and the court will file a decision in due course.